IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2005

## STATE OF TENNESSEE v. ANTONIO SANDERS

**Appeal from the Criminal Court for Shelby County**
**No. 02-05449     W. Otis Higgs, Judge**

---

### No. W2004-02356-CCA-R3-CD  - Filed August 19, 2005

---

A Shelby County Criminal Court Jury convicted the defendant, Antonio Sanders, of two counts of first degree felony murder; two counts of aggravated robbery, a Class B felony; one count of aggravated burglary, a Class C felony; and five counts of attempted aggravated robbery, a Class C felony.  The trial court merged the two counts of first degree murder together and the two counts of aggravated robbery together and sentenced the defendant to life imprisonment for the felony murder, eight years for the aggravated robbery, three years for the aggravated burglary, and three years for each count of attempted robbery, all to be served concurrently.  The defendant appeals, claiming that the evidence is insufficient, that the trial court improperly approved the use of an interpreter at trial, and that the trial court erred in ordering the sequestration of the jury.  We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Robert Wilson Jones, District Public Defender, Phyllis L. Aluko (on appeal), Robert C. Felkner, and Kindle Elizabeth Nance, Assistant Public Defenders, for the appellant, Antonio Sanders.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Paul F. Goodman and Michelle L. Kimbril-Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to the November 9, 2001, killing of Teadoro Mata.  At trial, Carlos Mata testified that on November 9, 2001, he lived at 5473 Jasmine Cove with his brothers, Teadora and Nicholas Mata, and friends Juan Dorado, Jaime Vallierra, Arturo Garcia, and Adolfo Kaylen.  He said that he was in his bedroom when the defendant, armed with a gun and wearing a mask, entered the house and demanded that everyone give him money.  He said he threw his wallet containing over $500 at the defendant.  He said that he went into the kitchen and that while there, the defendant shot

his brother, Teadora Mata, and that after the shots were fired, he and his friends attacked the defendant. He said that he took the pistol away from the defendant and hit him and that after he took the pistol away from the defendant, Mr. Kaylen took the gun from him and left the room with it. Carlos Mata said that the defendant fell and that they removed his mask while he was lying on the ground. He identified the defendant as the man who wore the mask and shot his brother.

On cross-examination, Carlos Mata said that he did not know whether the murder weapon was a semi-automatic, a .38 caliber, or a .22 caliber pistol. He said the weapon in the picture that was shown to him is the one he took away from the defendant. He acknowledged that he understood some English and said that at the time of the murder, he had been in the United States for two years. He admitted that in his original statement, he told the police he only had $20.00. However, he said there was $800 hidden in the wallet that he did not tell the police about. He said that the defendant knocked on the kitchen door, that someone let him in, and that he had never seen the defendant before. Carlos Mata admitted that Mr. Kaylen called 9-1-1 twenty minutes after the defendant entered the house.

Nicolas Mata testified that on November 9, 2001, he lived at 5473 Jasmine Cove with six other people and that during that evening, his brother, Teadoro Mata, was killed. He said that he heard someone knock on the door and say something in Spanish and that although he could not see who knocked, he opened the door anyway. He said the defendant wore a mask and was armed with a pistol. He said that the defendant told him to walk toward the living room and demanded money but that he did not have any to give him. He said he heard a shot and saw Mr. Dorado and Mr. Kaylen struggling with the defendant. He said that he grabbed the defendant, that he and his friends knocked the defendant down, and that his brother, Carlos, took the pistol away. On cross-examination, he admitted that he did not remember what the defendant said to get him to open the door. He said that friends stop by all the time and that he thought a friend was at the door. He said that the defendant entered the house around 10:00 p.m. and that someone called 9-1-1 approximately fifteen minutes later.

Arturo Garcia testified that on November 9, 2001, he lived at 5473 Jasmine Cove with six other people. He said the defendant entered the house wearing a mask and armed with a pistol and ordered everyone to move into the kitchen. He said that he heard gunshots and that he and his friends jumped onto the defendant, disarmed him, and called 9-1-1.

On cross-examination, Mr. Garcia said he was in the bedroom with Carlos Mata watching TV and did not hear anyone knock on the door or speak to Nicholas Mata. He said the defendant told Carlos to give him his wallet. He said that he and the other men beat the defendant with beer bottles and hand bar-bells and that the defendant was injured. He said that Carlos disarmed the defendant but that he did not see what Carlos did with the gun.

Memphis Police Department Officer Angelo Jennings testified that around 10:00 p.m on November 9, 2001, he received a call to go to 5473 Jasmine Cove. He said he was met at the kitchen door by two Hispanic men who were screaming and crying. He said that when he entered the door,

he saw an unresponsive man lying on the floor with multiple gunshot wounds. He said the other men pointed him to the next room where he saw the defendant lying face down on the floor. He said the defendant had been badly beaten. He said his duties were to get an ambulance to the crime scene and make sure that no one left. He said he wrote an arrest ticket for the defendant, whom he identified in court. Officer Jennings said he transported the victims for questioning but otherwise was not involved in the murder investigation.

On cross-examination, Officer Jennings said the Spanish-speaking officer arrived twenty to thirty minutes after he did. He said that during this time, the residents of the house were contained in separate cars but that he did not know whether they talked among themselves. He said that he placed the defendant under arrest and that Memphis Police Department Officer Wayne Colson searched the defendant before he was taken away in the ambulance. Officer Jennings said Officer Colson found a wallet on the defendant belonging to one of the victims. He admitted that he did not find a gun and that part of the arrest ticket was filled out by another officer.

Officer Colson testified that on November 9, 2001, he received a call to 5473 Jasmine Cove involving shots fired. He said that when he arrived at the house, there was a female outside and five or six males inside. He said that in order to get into the house, he stepped over a body. He said there were broken bottles, glass fragments, and blood all over the kitchen area. He said that he found the defendant, who had been badly beaten, lying on the floor in another room bleeding heavily and one of the victims holding the defendant on the floor. He said that a search of the house revealed a gun in the bathroom. He said that when the paramedics arrived and turned the defendant around, he found a wallet containing a small amount of cash and some papers. He said he did not go through the papers and gave the wallet to the paramedics to put with the defendant's belongings.

On cross-examination, Officer Colson admitted that there was not much blood around the victim but that there was a lot of blood in the area around the defendant. He acknowledged that the blood appeared to be the defendant's. He said the defendant appeared to have severe wounds to his head, arms, and back. He said he did not touch the gun because he was afraid of contaminating evidence before the crime scene unit arrived.

Memphis Police Department Lieutenant Robert Shemwell testified that on November 9, 2001, he was told to go to the hospital to check on the defendant and to obtain his identity. He said he searched the defendant's wallet and found a piece of paper with the name Carlos Mata on it and $20. He said he returned the wallet to Carlos Mata when Mr. Mata's statement was taken. He said that he requested a crime response unit to fingerprint the suspect and to test him for gunshot residue. He said that the suspect was identified as Antonio Sanders and that a short-cut existed from the victims' house at 5473 Jasmine Cove to the defendant's house at 3814 Hyacinth Drive. He said that although he received the defendant's name from the medical staff, he obtained a thumbprint to verify his identity. On cross-examination, Lieutenant Shemwell admitted that the short-cut from the defendant's house to the crime scene was open to the public. He said the defendant's house was about 100 to 150 yards from the crime scene. He acknowledged that the wallet did not contain $500.

Memphis Police Department Captain James Fitzpatrick testified that he had been the scene coordinator in the investigation in this case. He said he was told that a robbery had occurred, that the suspect had been taken to the hospital, and that the deceased victim's body was in the kitchen. He said at least three victims were at the scene when he arrived. He said that his duties included taking mental and written notes of the scene and reducing them to supplemental form when he returned to the office. He said that he entered the house through the living room and continued into the den, which was in total disarray. He said that the struggle occurred in the den and that blood and broken furniture were all over the den floor. He said he found the victim's body in the kitchen and gave it a cursory examination before crime scene personnel arrived. He said that he searched the rest of the house including the bathroom and the bedrooms but that he did not find any other evidence.

On cross-examination, Captain Fitzpatrick said that he did not believe the bar-bell had been used as a weapon. Based on his experience, he believed the blood on the bar-bell to be blood transferred from the victim to the bar-bell by the medical personnel who treated the victim. He said his job was to examine the scene closely, record important details, and prepare a supplemental report. He said Memphis Police Department Sergeant Ernestine Davison was the case coordinator in the investigation.

Sergeant Ernestine Davison testified that she talked with the defendant in the intensive care unit of the hospital on November 12, 2001. She said that she identified herself and asked the defendant how he felt and that he responded he did not rob the victims. She said the defendant told her that he was on his way home when he was pulled inside the house where a gun was held on him and he was beaten in an attempt to rob him. She said the defendant claimed the gun was not his and that it was twisted out of his hand while he was wrestling for the gun, causing it to discharge. She said that the defendant claimed he was innocent and that someone else robbed the victims. Sergeant Davison identified the defendant and the pictures she took of his injuries on November 12. She said the defendant was alert and did not have any problems answering or asking questions. She said the supplemental report did not indicate that any other officers spoke directly with the defendant concerning the case. She said that according to Lieutenant Shemwell's report, the defendant gave his personal information to the doctors and Lieutenant Shemwell did not speak with the defendant. She said the defendant was informed of the charges against him but not of the details surrounding the investigation.

On cross-examination, Sergeant Davison admitted it was possible that another officer talked with the defendant before she did or that the defendant learned of the charges against him through medical personnel, but she said that details of an investigation are generally not released to the hospital because it could "mess up the case." She also acknowledged that it was possible that another officer spoke with the defendant before November 12, that the defendant knew why he was in custody, and that he knew why he was interviewed on November 12.

Memphis Police Department Officer Tina Crowe testified that she was assigned to the crime response unit that processed the crime scene at 5473 Jasmine Cove. She said the crime scene response unit found (1) the deceased victim lying in the kitchen doorway, (2) a .380 shell casing in

the kitchen doorway, (3) a bullet fragment in the kitchen wall, (4) a baseball cap located under a wooden table in the kitchen, (5) another .380 casing located on the floor between a chair and the refrigerator, (6) a Halloween mask located on a chair in the kitchen, (7) two tennis shoes, (8) a pair of jogging pants, (9) a jacket, (10) a pile of bloody clothes, and (11) a .380 semi-automatic handgun. She said that the victim had bullet wounds in his chest and arm and that blood was in the den. She said the gun had blood on it and a shell casing jammed in the extractor port. She identified the gun entered into evidence as the gun found at the scene.

On cross-examination, Officer Crowe acknowledged that the gun was a semi-automatic weapon and that the shell casings found in the kitchen indicated the gun was fired there. She said the only other shell casing was found in the bathroom jammed in the gun. She admitted no tests were performed to determine if the apparent blood was actually blood, but she said it appeared to be fresh blood. She also acknowledged that blood appeared to be on the kitchen wall. She admitted that the scene was not dusted for fingerprints and that no hair or blood samples were collected. She said that she was unsure whether the gun was chemically processed for fingerprints. Officer Crowe said she only sketched the crime scene and tagged the evidence while Memphis Police Department Sergeant Alvin Peppers wrote the report and took pictures. She said that uniformed officers secured the scene and located evidence and that her job was to sketch the scene and tag the evidence. She said she did not go into the living room or the bedrooms because there was no evidence in those rooms.

Sergeant Peppers testified that he was called to 5473 Jasmine Cove as part of the crime response team. He said the investigator on the scene, Sergeant Fitzpatrick, determined what to photograph and what to tag as evidence. He said pictures were taken and a sketch was made of the crime scene. He said the sketch did not include the living room or bedrooms of the house because the investigators had determined the rooms were not part of the crime scene. Sergeant Peppers said he searched the entire house and did not find anything of importance in the additional rooms.

On cross-examination, Sergeant Peppers said that he assisted Officer Crowe by measuring the rooms but that Officer Crowe did the actual writing and sketching herself. He said that his duty was to photograph the crime scene. He said that he recovered the gun and admitted that he did not test it for fingerprints. He did not recall whether the gun was chemically tested for prints. He acknowledged no tests were performed to determine if the blood was human blood or to whom it belonged. He said he noted the blood in the kitchen in his handwritten report.

Memphis Police Department Sergeant Michelle Oliver testified that on November 10, 2001, she was notified by the dispatcher to go to the hospital to fingerprint the defendant, tag his clothing, and perform a gunshot residue test. She said that she performed the gunshot residue test at 1:15 a.m. She said that the defendant's left hand was bandaged and that she could only test the fingertips but that she was able to test all of his right hand. She said she took two prints of the defendant's right thumb, tagged his clothing, and gave the thumbprints to a fingerprint technician. She said the technician was unsuccessful in matching the prints to anyone in the computer system but that the computer system did not include juvenile offenders. She said that after the technician gave her the

thumbprints back, she tagged the prints, the gunshot residue kit, and the defendant's clothes and checked everything into the property room. She said that the gunshot residue kit was checked back out and given an identification number before being sent to the TBI for testing.

On cross-examination, Sergeant Oliver admitted she did not remember if the defendant's right hand was bloody. She said she could not testify as to the purpose of the gunshot residue test. She said that she had done approximately fifty gunshot residue tests and that she performed the test the same way every time.

Tennessee Bureau of Investigation Crime Lab micro-analyst Laura Hodge testified that she examined the gunshot residue kit performed on the defendant. She said that although the gunshot residue test was negative, the results did not rule out the possibility that the defendant fired or handled a gun, or was near a gun when it fired. She said the presence of gunshot residue can be affected by the type and condition of the gun and by the activity of the individual being tested. She said that cleaning and bandaging a wound could affect the test and that the test could also be affected if a person were involved in a struggle where the gun was taken away by force. She said anyone in close vicinity to a gun when it is fired could test positive for gunshot residue. She said that she did not participate in any ballistics testing of the gun and that ballistics testing does not test for the amount of gunshot residue from the gun.

On cross-examination, Ms. Hodge admitted that it was possible that the defendant did not fire a gun. She also admitted that this weapon might cause a lot of gunshot residue. She said no clothing was sent to the lab to analyze for gunshot residue. She acknowledged that even if the subject were unconscious and their hands purposely not cleaned until after the gunshot residue test was performed, other variables could affect the test results between the firing of the gun and the person becoming unconscious. She said there could be gunshot residue on either hand regardless of whether the shooter held the gun with one or two hands.

Shelby County Medical Examiner Dr. O'Brian Clarey Smith testified that he examined the body of Teadoro Mata. He said that the victim tested negative for alcohol and drugs and that the cause of death was two bullet wounds to the chest. He said the path of the bullets indicated that the victim was possibly leaning toward the shooter. He said that he could not identify which bullet struck first and that the different paths of the bullets could indicate that the victim moved before the next bullet hit him.

On cross-examination, Dr. Smith admitted that he did not visit the crime scene. He said his examination of the victim did not indicate much external bleeding. He said the angle of the bullet's path could be affected by whether the victim or the shooter was moving. He acknowledged that the wounds to the victim could be consistent with someone who was involved in a struggle with another person or any other scenario that puts the body in an extreme angle to the gun. He said the absence of powder burns on the victim indicated that the gun was fired from more than two feet away or that the bullet traveled through an intermediate target such as a sheet of paper. He acknowledged, however, that the victim's shirt could have prevented powder burns on his skin.

The stipulation of facts entered into proof by the state reflected that Steve Scott, an expert in firearms and ballistics, examined the gun, the bullets recovered from the scene, the bullets recovered from the victim, and the bullet casings found at the scene. Mr. Scott's report stated that the three bullets and the three bullet casings were fired from the gun found at the scene and that the gun was an operable weapon with a properly functioning safety device.

The defendant testified that on November 9, 2001, he was on his way home from the bowling alley where he had been playing pool. He said that he took a short-cut through Jasmine Cove to get to his house at 3814 Hyacinth Drive. He said that a man approached him in a park wanting to buy drugs and that he sold the man $1,600 worth of drugs. He said as he continued to talk to the man, two other men approached him and asked if he had drugs to sell. He identified one of the men as Carlos Mata. The defendant said he followed the men to the side of their house where he intended to sell the drugs. He said that instead of money, Carlos pulled a pistol out of his pocket and asked where were the drugs and money and that men inside the house turned off the kitchen light. The defendant said that he punched Carlos when he looked away and that he fought with him over the gun. The defendant said someone behind him hit him with something hard and heavy. He said he fought the men and fell through the door into the kitchen. He said that the gun fired while he was fighting in the kitchen but that he did not see who was shot. He said that the fight continued and that he was dragged into the living room and beaten. He said the men removed all of his clothing and took everything he had. He said he received several injuries to his face, head, and hands. He said the next thing he remembered was waking up in the hospital and being informed by a Shelby County Sheriff's deputy that he was being charged. The defendant said that he did not know any Spanish, that he did not shoot Teadoro Mata, and that he did not rob anyone.

On cross-examination, the defendant testified that he did not know how Carlos Mata's wallet came into his possession and that it was possible someone put the wallet there. The defendant admitted that he was not employed at the time of the incident and that he made a living as a drug dealer. He admitted that he knew the men who lived at 5473 Jasmine Cove and said that he sold cocaine to Carlos Mata at the house several times before. He said that another man, whom he could not identify, approached him and asked in English if he had drugs for sale. The defendant said that he agreed to sell them twenty-eight grams of crack-cocaine for $1,600. The defendant said he followed them to the house so Carlos Mata could get the money for the drugs. The defendant said that he was not wearing a mask. He said that he was not afraid of the men and did not carry a weapon. He said he was not worried that someone would try to steal his crack cocaine.

The defendant testified that the gun went off while he was fighting the men. He said he grabbed Carlos Mata's arm to keep from being shot, but he could not remember if Carlos held the gun in his left or right hand. However, the defendant later said that Carlos held the gun in his right hand. He said he was holding Carlos' right wrist with his left hand when the gun went off. He said that he never touched the gun. He said that he could not remember if he was standing or lying on the ground when the gun went off but that because he did not fall until he was in the living room, he must have been standing. He said that although he was close to the gun when it went off, he could not remember how many shots were fired.

The defendant testified that he remembered telling Sergeant Davison that his aunt had asked him to stop the Mexicans from "jumping on her." He said they used to date his aunt. The defendant said he also remembered telling Sergeant Davison that he was dragged into the house, that someone pulled a gun on him, that he fought with the men, and that he did not rob them. The defendant admitted he told Sergeant Davison that the gun was not his before she asked him about the gun. He admitted he did not tell her that his fingers were broken when the gun was twisted out of his hand. He also said he was not in his "right mind" when he talked to Sergeant Davison because of the beating.

The defendant said that when he woke up at the hospital, his cocaine was missing. He said he did not know who took his cocaine, but he thought his assailants did. He said he kept his cocaine in the pocket of his shorts that he wore underneath his jogging pants. He said that in addition to the cocaine, $3,500 was missing. He maintained that notwithstanding the amount of cash, the cocaine, and his aunt's previous trouble with the men, he was not worried that someone might rob him.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to support his convictions. He claims that the state failed to prove he was the aggressor, that the blood at the kitchen entrance was his and not the victim's, that the state failed to link the defendant to the mask through hair fibers or blood, and that the jury should have discredited Carlos Mata's testimony due to inconsistent statements concerning the amount of money in the wallet. He asserts the he did not go to the victims' home and attempt to rob them. He contends that the men pulled a gun on him outside the house, that he fought back, and that during the struggle the gun discharged, killing the victim. The state responds that the evidence is sufficient. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

To convict the defendant of felony murder, the state was required to prove that the defendant "killed another during the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." T.C.A. § 39-13-202(a)(2). Regarding felony murder, the state is not required to prove a culpable mental state except that necessary to commit the underlying enumerated offense. T.C.A. § 39-13-202(b). The underlying felony supporting the defendant's conviction for felony murder is aggravated robbery. To convict the defendant of aggravated robbery, the state was required to prove that the defendant "intentionally or knowingly took the property of another by

violence or putting the person in fear" and that this was "accomplished with a deadly weapon." T.C.A. §§ 39-13-401, -402.

To convict the defendant of the attempted aggravated robbery offenses, the state was required to prove that the defendant

> (1) intentionally engaged in action or caused a result that would constitute an offense if the circumstances surrounding the conduct were as the person believed them to be; (2) acted with intent to cause a result that is an element of the offense, and believed the conduct will cause the result without further conduct on his part; or (3) acted with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believed them to be, and the conduct constituted a substantial step toward commission of the offense.

T.C.A. § 39-12-101. To convict the defendant of the aggravated burglary offense, the state was required to prove that the defendant, "without the effective consent of the property owner," entered a habitation "with intent to commit a felony, theft, or assault." T.C.A. §§ 39-14-402, -403.

In the light most favorable to the state, the record reflects that Carlos Mata testified that on the night of November 9, 2001, he was robbed by a masked man armed with a gun who entered his home on Jasmine Cove; that the masked man shot and killed his brother, Teadoro Mata; that he and his friends attacked and disarmed the man; and that when the mask was removed, they discovered the defendant was the assailant. Carlos Mata's testimony was corroborated by that of Nicholas Mata and Arturo Garcia. Officer Colson found Carlos Mata's wallet in the defendant's pocket and although the defendant tested negative for gunshot residue, someone could be in close proximity to a gun when it is fired and still test negative for gunshot residue. We conclude that the evidence was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt of murder in the perpetration of robbery, aggravated robbery, attempted aggravated robbery, and aggravated burglary. Obviously, the jury accredited the state's witnesses over the defendant and all issues of credibility were resolved by the jury. See Bland, 958 S.W.2d at 659.

## II. JURY SEQUESTRATION

The defendant contends that the trial court erred in overruling his objection to a sequestered jury because the trial judge failed to consider all facts necessary to meet the "sound discretion" test required by T.C.A. § 40-18-116. The state claims that the issue is waived because the defendant failed to object to a sequestered jury. Furthermore, the state claims that the defendant is not entitled to relief on the merits of his claim because, under T.C.A. § 40-18-116, sequestration of the jury is left to the sound discretion of the trial judge and because the defendant does not show that he was prejudiced by the sequestration of the jury.

We note that the court reporter states in the trial transcript that the parties agreed to a sequestered jury before the start of the trial. We further note the defendant claims in his brief that he objected to the trial court's sequestration of the jury. The defendant's brief cites his argument at the motion for new trial as evidence of his objecting to the trial court's sequestration order. The record, however, is devoid of such an objection. If the defendant objected during the voir dire phase of the proceedings, it was his duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review. See T.R.A.P. 24. Because the record reflects the defendant agreed to jury sequestration and failed to show his objection to the arrangement, we conclude the defendant is not entitled to relief on this issue.

## III. INTERPRETER

The defendant contends that the trial court erred by failing to follow the guidelines established by Tennessee Supreme Court Rule 42 regarding the use of an interpreter at trial. He claims that the court's failure to use two certified interpreters violated Rule 42 and that the interpreters' oaths were not properly given. The State claims that the defendant has waived this issue because he failed to object, that this issue is without merit, and that even if the issue is not waived and constitutes error, the error is harmless.

The record reflects that the certified interpreter first raised the issue of using two interpreters. She informed the trial court that she believed the correct procedure under Tenn. Sup. Ct. R. 42 required the use of two interpreters when the proceedings will last more than an hour and a half or two hours. When asked if he objected to this procedure, the defendant's counsel stated, "Well, if they have to do that, that's fine. But it just seems to be distracting to go from one to the other and then back to the other. But, I mean, if that's what they say they have to do I guess we have to live with it."

Based upon this information, the trial court ordered the interpreters to alternate witnesses, and the defendant did not object. Defense counsel then questioned the certification of the second interpreter, and it was discovered that although the second interpreter had interpreted in Tennessee courts on three prior occasions, she did not have certification. The defendant's counsel then stated, "[I]f the rules call for Certified Court Interpreters and she is not Court Certified, then I think that raises an issue. But if we need two, then I think that you would need two Court Certified Interpreters. Not one and not one in training, so to speak." The state said that it was not aware that two interpreters were required and the trial court agreed stating "I have never heard of a requirement for two interpreters. We don't require two interpreters. I thought that this was a matter of convenience . . . ." The certified interpreter informed the court that Rule 42 only required a registered interpreter and not a certified interpreter. She also said that she believed the second interpreter was registered. The state suggested that the court use the certified interpreter to translate the testimony of the witnesses and allow her to consult with the non-certified interpreter if needed. The trial court adopted the state's suggestion. The record is devoid of any objection by the defendant to the trial court's decision to proceed with one certified interpreter and allow her to consult with the

non-certified interpreter as needed.  We conclude that the defendant has waived this issue by his failure to object at the trial.  <u>See</u> T.R.A.P. 36(a).

Concerning the defendant's contention that the oath administered to the interpreter failed to comply with the prescribed interpreter's oath in Rule 42, we note the defendant failed to object to the oath administered by the court and did not raise the issue in his written motion for new trial or at the motion for new trial hearing.  The defendant has waived this issue.  <u>See</u> T.R.A.P. 3(e), 36(a).

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE